Thank you, Your Honor. May it please the Court, Counsel, my name is Paul Gomez. I represent CRST Expedited, Inc., the appellant cross appellee in this case. CRST seeks the full reinstatement of its full jury verdict that it obtained in July of 2019 after a one-week jury trial where the jury heard evidence that its competitor, Swift Transportation, intentionally and knowingly fired on 246 occasions CRST drivers that it knew were subject to a short-term non-compete of 10 months or less. Drivers that had entered into these non-compete agreements in part in exchange for valuable training to drive a truck in interstate commerce and training that resulted in them obtaining a commercial driver's license, a very valuable license that allowed them to improve their career prospect and enter into an industry that had been having a driver shortage for years. Now, post-trial, the district court committed a fundamental error of the law in granting judgment as a matter of law in favor of Swift on CRST's unjust enrichment claim, abused its discretion in remitting the punitive damage award from $5 million to $3 million, but the tortious interference claim and the verdict there should be affirmed because the record evidence supports the jury instruction and is in accordance with Iowa law. I'd like to begin with the unjust enrichment claim. In this case, the district court instructed the jury in instruction number 16 and 17 that the benefit conferred on Swift were the driver's services, and that's exactly right. The driver's services were pledged to CRST and Swift appropriated those services for themselves. Post-trial in one of the errors the court committed on the unjust enrichment claim, it re-characterized the benefit conferred by stating that it was the driver's services without the need to train these drivers. Training was not at issue in this case. What was at issue was appropriating the services of these drivers when their services had been pledged to CRST. The second more fundamental error... Counsel, what was your evidence at trial that your client was unable to replace the services of these drivers during this period? The evidence at trial was that CRST and Swift both struggled to meet their goal of hiring enough drivers, and that CRST could not hire enough drivers. They were always short on drivers. This was not a situation where they had qualified drivers available to them to replace the drivers that Swift hired away. This is an industry where trucking companies are constantly trying to get enough drivers into their trucks. There's more freight to deliver than there are drivers to deliver. CRST attempted to do that, but was always short on drivers throughout that time, and its executives testified to that effect. Going back to the unjust enrichment claim here, the fundamental legal error was that the court concluded that somehow the disgorgement of the financial gain was not available to CRST under an unjust enrichment claim. It is available to CRST in Iowa according to applicable law. In instruction number 17, the district court specifically stated that the measure of damages for the unjust enrichment claim is the value of the driver's services, and CRST furnished the jury with that evidence. Through David Sousa's testimony in Exhibits 44 and 59 that are in the appendix in this case, CRST presented evidence that Swift profited for each day for each one of the 246 drivers for the amount of days that they worked for Swift. That evidence was presented to the on its unjust enrichment claim. That award is consistent with Iowa law for available damages on the unjust enrichment claim. This court in the Trans Am decision, citing Hanlos and Unisys, made clear a very important point about unjust enrichment. It stated that according to Iowa law, benefits can be conferred directly from the plaintiff to the defendant, but they can also be conferred by a third party to the defendant. That's in Unisys and Hanlos. And that the benefits can be conferred directly or indirectly. More importantly on the subject of damages, this court in Trans Am said the following, the profits reaped by Trans Am as a result of hiring these drivers are at the very least an indirect result of CRST's ICONCO, a decision that we believe resolves this issue in favor of CRST. ICONCO is a situation where a third party, the Corps of Engineers, awards a contract to Jensen. Jensen performs that contract. That contract should have been awarded to ICONCO. ICONCO brings suit on unjust enrichment. The relief granted to ICONCO is what matters for the resolution of this issue. Because the contract has already been performed, Jensen cannot return that contract to ICONCO. It's already been performed, but it reaped the benefit, the financial benefit from that contract and the profits from that contract, what the value of that contract was, and that was remitted back to ICONCO. Here we have third party, the drivers conferring a benefit on SWIFT. SWIFT reaped financial rewards from that and that should be returned to CRST just like ICONCO. ICONCO is good law in Iowa. It has been cited in unisys by the Iowa Supreme Court and as recently as 2012 cited by the Iowa Court of Appeals. What the court relied upon for its rationale in this case was Katapovich versus Turley, a decision that is factually an opposite. In Katapovich, the benefit was conferred directly by the plaintiff upon the case. That case held that what Dr. Katapovich did in that case is he performed finder services for Mr. Turley. He found people and locations to build an ethanol plant in Eastern Europe and there is a market value for those finder services. And at trial, Dr. Katapovich was paid for the value of those finder services. The only thing that Katapovich states that he could not recover is a share in the ethanol plant that was ultimately built as a result of those services. We are not, CRST is not asking for any contract that SWIFT was able to secure because they secured the services of the 246 drivers. CRST is asking for the value of those services precisely what the court instructed the jury in instruction number 17, precisely in accordance with the evidence that was presented on that point and the unjust enrichment claim decision of the district court should be reversed and that verdict reinstated. Moving on to the unjust enrichment claim in this case, I'm sorry, to the punitive damage claim in this case. This court found in this case that there was sufficient evidence for punitive damages. It found that there was no constitutional problem with the punitive damages. They were not disproportionate to the compensatory damages, 5 million to 3 million, but somehow concluded that the conduct was not reprehensible enough for 5 million and decided to remit that award to $3 million. The court erred in CRST's opinion here by focusing on the wrong conduct post-trial. Post-trial, this was a tortious interference with contract claim focused on the interference with an employment contract that contained a non-compete provision. Post-trial, the court talked about remitting this punitive damage award based on its assessment that the recruiting that SWIFT engaged in was passive. This case was not about SWIFT's recruiting. It was about the knowing extending of an offer for employment to an employee that they knew was subject to a non-compete. So the court focused on the wrong conduct post-trial in the punitive damages. Isn't that relevant though to improper motive? I mean, yeah, I get it that we're talking about punitive damages, but I think even the majority in Trans Am would suggest that that was relevant for improper motive. In terms of the interference with contract claim. Correct, because that's the basis for the punitive damages. You can't get my understanding on an unjust enrichment claim. You're correct, Your Honor. But that was not the only evidence of SWIFT's motive in this case. This case is far more of a factual record than Trans Am did. And here, the evidence on improper motive and the evidence does overlap with the punitive damage evidence. And it's as follows. In this case, Exhibit 41 was an internal strategic meeting that SWIFT had where it identified its inability to get the 400 drivers hired per week. What it decided to do in that internal document was to pursue CRST's drivers that it knew to be under contract. It made a strategic decision to do that. This wasn't an accidental hiring of drivers that happened to be CRST drivers. It decided to abandon years of honoring the notices they would receive from CRST that told them these individuals are under contract with CRST and start to pursue them. Further evidence, they knew that CRST's program was a 10-month program that required an apprentice wage so they could step in and pay more to each one of these individuals that came to them and basically have CRST front the cost of this program, incur all of the investment in it, and free ride on the benefit of these drivers. SWIFT was a training company. There was evidence that they could have easily offered this same program if their two-year commitment program was not attracting enough drivers. Well, counsel, you're not addressing what bothers me, which is that this is a, these are at-will contracts with a limited non-compete provision that the employee was free to get out from under by paying back the training costs as well as quitting, right? I don't believe that's completely right, your honor. Well, there's this notion that it was, and I guess SWIFT like Trans Am wants to argue this was a permanent non-compete and therefore invalid, but it wasn't. If the employee paid back the training costs, he or she could quit during the non-compete period, right? If they paid back the training costs, which they did not. And then the non-compete was gone. And the non-compete was gone, your honor. Therefore, if SWIFT didn't know, if didn't induce the employee to not pay back the situation, in my view. This is a, this is a situation, your honor, 768 makes very clear that this is an unfair competition situation because the at-will, because the non-compete is not at-will, it's for a term. And in that situation, 768 of the comments. But it's, it's, it's terminable at-will by the employee by repaying, right? The non-compete is in place and not until the, the, until the employee either pays or performs for CRST. And that did not happen. If the employee, and as I understand it, there was no, there's no proof here that, that SWIFT induced them not to repay or even knew whether or not they did repay. And under 768, that affirmative inducement is not. I think you're wrong. I think you're wrong, frankly. And certainly Trans Am did not begin to address that issue. Trans Am did not begin to address that issue, but 768 does address the issue and states that competition is the only reason for interfering with a non-compete that is not. Wait a minute. Wait, counsel, by my hypothesis, it's not interfering with the non-compete unless the training costs are not repaid. And they were not, they were not repaid. When they. Wait, is there proof of that? Yes, there is proof of that. How many of the 246 did not repay and what's the evidence? None. And what's the evidence, pardon? None of them repaid. The evidence in this case. What's the evidence that SWIFT knew that? The evidence that SWIFT knew that is every time that they received a verification from CRST informing them these individuals are currently under contract with CRST. They received that notice every time and CRST presented evidence in this case through David Souza, its CFO, that every single one of these 246 drivers at the time SWIFT hired them was under contract. They had not repaid $6,500. And was the notice to SWIFT that you're talking about, was that pre-hire or post-hire? Pre-hire. Okay. That's my point. That's my point. And at the time that they hired them, the evidence was they had not repaid. That was David Souza's testimony. At the time that they hired them, there was a valid non-compete. We're talking about bad motive and punitive damages. Correct. I'm saying there's no evidence. And you're saying the district court got it all wrong because he didn't focus on the non-compete. And I'm saying it was a non-compete terminable at will. And that is tremendously significant to the motive. I think it's significant to the interference finding, frankly. It had not been terminated or ended at the interfered with it. To follow up on that question, if the notice came before, how did SWIFT know that the employees didn't pay back the $5,500 in the interim? Which I think is another way at getting at Judge Loken's question, which is, I mean, it didn't seem to me that they had noticed. I mean, you could presume that they're just going to pay back the $5,500 once they're hired. Your Honor, to your point of their notice, we've cited in our briefing a revere transducer, which is the law in Iowa on notice on this point. Once they know that there's a contract, they've been made aware of the contractual obligations, they're on inquiry notice to find out whether or not that this employee is under contract. They didn't do that. They went forward with hiring them. And so they had noticed with each letter that they received from this employee is currently under contract with CRST. They had the contracts in their possession. They had access to these drivers to determine whether they had actually fulfilled their contract or not. And they didn't do that. And every single one of these 246 drivers was actively under contract at the time that SWIFT hired them. All right. Let's see, time's up. Let's hear from Mr. Cloutier. May it please the court, counsel? My name is Kevin Cloutier. I represent SWIFT Transportation, Appalachia Cross Appellant in this matter. Is it your position that Trans Am does not govern law here? Well, we can harmonize things with Trans Am in exactly the way that your last question... Answer the question, because it's very significant. Trans Am is governing for what it decided, Your Honor, but it did not decide everything here. And with the benefit of a fuller record... All right. No, that's fine. Thank you, Your Honor. Let me start with the points that were raised by the questions from Judge Loken and Judge Strauss. And this goes to... There's one fundamental issue that goes to three elements. One, breach. Two, notice. Three, impropriety. So the fundamental issue is that Judge Loken focused on is that there is only a breach of contract by the drivers if they have not served the full 10 months and have not paid the $6,500 when they begin driving for SWIFT. That's the only way there can be a breach. So CRST's entire evidence of breach is that they sent out contract notice letters. And these contract notice letters in response to inquiries from the Department of Transportation requirement that you do an employee verification. So when CRST gets that employee verification, they automatically generate and send out a contract notice letter. And right there, there's speculation as to when they send it, whether the driver is under contract. But let's assume... Let's give credit to that possible inference. There is no evidence that in the time between the contract notice letter and the time the driver starts working for SWIFT, that the driver hadn't paid off the $6,500. And this is exactly what you focused on. And CRST did not introduce a shred of evidence, not a shred, that the payment hadn't been made. What David Souza testified about is to the days remaining on contract, not the payment amount. In fact, he admitted, I don't know if one cent was paid back. I did not analyze the repayment by the driver because it was not relevant to my analysis. Jenny Abernathy, the only thing that she testified about was the driver's status at the time the contract notice letter was sent out, which oftentimes was weeks or even months before the no evidence that there was breach. And there's certainly no evidence that SWIFT knew of a breach. As SWIFT indicated witness after witness, we didn't know what the repayment status of the drivers was. And the burden for breach was on CRST to establish breach for each and every one of the 246 drivers. They failed. It was a fundamental failure. And where... How was the jury instructed on this issue? The jury was instructed exactly what I said. You have to find, there are contracts in place. You must find that the driver has not repaid $6,500 and that the drivers began or worked for SWIFT before satisfying the 10 month obligation. Counsel, help me with one other thing. So my understanding of this repayment is this has been longstanding by CRST. And although it wasn't emphasized in the Trans Am case, my understanding was it was there too. It was sitting in the background, but the employees had the opportunity to pay that back. So why doesn't Trans Am control on that point? Trans Am didn't reach that issue, Joe Strauss. Maybe it was lurking in the background. The record just did not reach it and Trans Am didn't push that argument. So maybe there was an assumption that because it was within the term, the so-called term, that there was a breach, but that's not enough. There are two conditions. So Trans Am doesn't even reach it there. Remember also Trans Am was a 12B6 case. Exactly, Your Honor. Exactly. And so the evidence in the record was just far different. And because that argument wasn't made and inferences should be given to the moving party there, it made sense that it wasn't addressed. But the fact is it is front and center in this case. So you referenced, Judge, the failure of breach, the failure of notice related to this repayment. Let me quickly move to the impropriety standards. So first on this issue, if SWIFT isn't inducing them to not pay their costs back, then they're not inducing a breach. And this is exactly what Judge Loken just referenced. And the standard is making it harder to satisfy a contract. SWIFT, if anything, by hiring them and having reimbursement provisions for individuals trained at other schools, made it easier for them to satisfy. Let me quickly get into impropriety because the district court respectfully misapplied the standards here. And CRST would argue that 768 suggests, and this is restatement 768, suggests that merely hiring an individual of knowledge of a noncompete is enough to satisfy the tortious interference standards in Iowa. Not so. Iowa is clear. There must be an additional element of impropriety. And Trans Am itself recognized this. And I'll discuss why in a minute. But 768 is from a state that does not require improper means. Minnesota, Medtronic, Magic Valley in Idaho, Fowler in Maryland. None of those states require improper means. And so maybe you can apply 768 as sort of a strict liability or a knowledge-based liability standard in those states. You can't use it to read out improper means in Iowa under cases like the 767 standards. And this is where the district court candidly ignored evidence or misstated evidence and misapplied the factors. So as all of you know, there are several factors to establish impropriety. And the court conflated the impropriety with competition and conflated 767 and 768 with a straight comment related to competition. Competition of itself is not unlawful. And even if 768 applied, it's only if competition is the only explanation. So moving to 767, if you read the Rule 59 order from the court, the first element is nature. The court said that the nature in this case was to hire drivers and increase profits. That's not nature. Nature has to do with the means, the method. And courts commonly find a nature violative suggesting impropriety if there is fraud, misrepresentation, threats, interrogations, things of that nature. Nothing there. As you noted, Your Honor, there was passive recruiting. And CRST wants to say this isn't about recruiting. It's about the hire. It's about the inducement. Okay? And the recruiting, it relates to the inducement. And here there was none. And so the lower court got that wrong by not even addressing the nature. They conflated nature and intent. On intent, the court said the intent was to hire drivers. Okay? There's nothing wrong with hiring drivers. And Judge Strauss, as you noted in your over another. So there's not an unlawful intent to look to hire drivers. And this is customary in the industry. As you saw in Trans Am and as you see in this record, trucking companies hire from one another all of the time. CRST hires from SWIFT, including SWIFT trained drivers. SWIFT has an academy. J.B. Hunt hires from both companies. As the former chairman and CEO, David Rush said, everybody hires everybody's drivers. Okay. So let's get to interest. Okay. And there are three elements of interest in impropriety. Very quickly. I'll deal with them together. The lower court suggested that CRST's interests are protecting its training program. Okay. But it completely discounted SWIFT's interests and societal interests. Societal freedom of movement, leaving unbearable working conditions, stifling mobility, restraints of trade. And this is where Restatement 774 comes in, which suggests that if a program or a contract stifles mobility or violates public policy or operates as a restraint of trade, then there can be no liability or damages. And 774 was completely ignored by the lower court, as were SWIFT's interests. So when you put all of this together, consistent with Judge Strauss' dissent, there is no impropriety. And just one other thing, because this was mentioned in Trans Am, and I want to make sure I mentioned it. There, the Trans Am opinion suggested, on a summary judgment standard, that it is possible if Trans Am knowingly offered superior terms to induce that perhaps, combined with 768, that could lead to impropriety. It was not a final holding on a full record. Our record is obviously different. SWIFT has set pay rates. It can't negotiate rates. It doesn't knowingly raise rates to CRST drivers. It offers what it offers. Nothing about that changes. And there's no evidence in the record, any of the recruiters knew what CRST paid. Now, there was one document that went around that was attached to an email that was technically in evidence, where it showed that CRST's leadership, or I'm sorry, SWIFT's leadership, looked into pay, competitive pay, for lots of competitors. CRST was one of them. That hardly imputes an intent to offer superior terms when you have set pay. Suppose there was a bonus. Suppose there was a bonus, if you were a SWIFT employee, and this was at issue in the Trans Am case, we're going to give you $5,000 extra. I mean, it was an issue in the sense that the majority were talking about it. In your view, would that then be improper interference if they were targeting CRST employees? I'm sorry, Your Honor. Yes, it could be. If there was a targeted bid up with a bonus, say, I know you're subject to a contract, Mr. CRST driver, with a non-compete, but I am going to offer you extra money as an inducement to come over, then that could be impropriety, and I could see how Trans Am would square with that. That is not what happened. The record does not contain that. Let me just briefly address this Exhibit 41, the A3, reflecting the practice change that SWIFT made. Just because it enters into the impropriety analysis, SWIFT did change its practice. At one point, it refrained from hiring drivers who were subject to alleged non-competes or contracts. Then in 2016, it decided to change that practice, and it changed it as related to all companies, because, and this is in evidence, there was a growing number of companies who were utilizing non-compete programs. This was not directed at CRST. The evidence is undisputed. It included other companies like Stevens and CR England and others. There is nothing directed at. Your Honor, I'm low on time, but there are a few other things I want to address. This contract is void as a matter of law, and SWIFT has the right to make this point. It has the right to challenge a protectable interest. That is not a voidable issue. That is a fundamental underpinning of any non-compete. It is a precondition to avoid a naked restraint of trade. It must be reasonably related to protect a legitimate business interest. Wasn't that rejected in Trans Am? It was not, Your Honor, with respect. It was certainly argued. It was implicitly rejected. I respectfully disagree. It was related to the scope of the non-compete, primarily the temporal term, but nothing assessed the viability of the underlying protectable interest, which is necessary to avoid the restraint of trade. Otherwise, this is similar to like the Jimmy Johns example, where you can bind a sandwich maker to a non-compete. Here, there is no contradiction. Three million truck drivers in the United States, a thousand a month at CRST who are trained from multiple different schools. This is not a school that was specific to CRST. Fifty percent of their under contract drivers came from schools other than CRSTs, another 15 percent from other schools beyond that. How many milk truck drivers do you suppose there were in the early 20th century when the courts were saying that that was a protectable interest? Well, Your Honor, that had to do with routes. It was pretty clear. Routes have to do with the goodwill and customer relationships, and they never ever held that a training program that's commoditized is a protectable interest. It has to be unique and specific to the employer where the employee can use.  Thank you, Your Honor. Mr. Gomez, have some rebuttal? Yes, Your Honor. With regard to 767... No, wait. No, no. You don't. Okay. I'll give you two minutes. Okay. Thank you, Your Honor. With regard to the 767 factors, those were instructed to the jury. Even if the court were to view this case as falling outside of 768, those factors were how the jury applied those factors post-trial. And in this case, there's record evidence from David Souza where he said clearly on the record that at the time that Swift hired these employees, they were still under contract with CRST, and notice was given to Swift with that effect. Each one of those factors was analyzed. One of the significant factors that I would ask the court to consider is that there was evidence in this record that Swift had more than enough candidates for these jobs. They had as many as 45,000 qualified candidates in one quarter alone that they could draw from, and they still went forward and intentionally hired drivers that were under contract with CRST. There was also evidence in this case of the societal interest where CRST is bringing drivers into this industry, an industry that needs drivers. It is advancing the cost of their training, and that could be weighed against Swift's freedom to act. And in this case, all Swift had to do was what it did for years, which is wait 10 months until the restrictive covenant expired. All of those factors were weighed by this jury. The court reexamined those factors under 767 post-trial and found that this jury correctly interpreted and was free to interpret those factors in CRST's favor and that this interference was improper. Counsel, I want to ask you, you had mentioned 45,000 drivers available, and I'm thinking to myself, how does that square with the fact that both parties, both Swift and CRST, are saying there's a massive driver shortage? Now that sounds completely contrary, so hopefully you can explain that to me. 45,000 qualified applicants they had in one calendar quarter alone to choose from that had applied for them. They needed 4,800 in that calendar quarter, so they did not need to hire CRST's drivers. Thank you. I think my time is up, and on behalf of CRST, I appreciate the court's time and consideration of this case. Well, thank you, counsel. The case has been thoroughly briefed, and we appreciate the fine arguments that have helped us move along through health. Makes oral argument much more helpful to court when it's well argued, so we appreciate that, and we'll take it under advisement.